IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 07-24 Erie |
| | ) | |
| MICHAEL P. MARZZARELLA | ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONST TO
MOTION TO DISMISS INDICTMENT**

AND NOW, comes the defendant, Michael P. Marzzarella, by his attorney, Thomas W.

Patton, Assistant Federal Public Defender, and respectfully files his Reply to the Government's

Response to His Motion to Dismiss Indictment.

The government's entire argument is based on the Supreme Court's statement that the

Second Amendment only protects those weapons typically possessed by law-abiding citizens for

lawful purposes.  The government extrapolates from that premise that **the government** gets to

decide which weapons are typically possessed by law-abiding citizens for lawful purposes

which, in turn, means that **the government** gets to decide which weapons the Second

Amendment protects.  In this case, the argument goes, possessing a firearm with an obliterated

serial number is illegal (because the government says so) therefore no citizen possesses a

firearm with an obliterated serial number for lawful purposes.  This argument is wonderfully

circular – the Second Amendment's purpose is to prevent the government from infringing a

citizen's right to keep and bears arms in his home but the government gets to determine which

firearms are acceptable to keep and bear.  Under this theory the government can pass a law

saying it is unlawful to possess a handgun and, thereafter, the people cannot keep and bear

1

handguns because no law-abiding citizen keeps and bears handguns so handguns are not protected by the Second Amendment.  Under this theory of the Second Amendment one can reasonably ask what purpose the Second Amendment's prohibition on government from infringing upon the right of the people to keep and bear arms serves when the government retains the power to determine which arms a citizen can keep and bear?  This argument turns the Second Amendment on its head, giving the government the right to tell the people what arms they may keep and bear.

When read in context, the Supreme Court's statement that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns" does not support the government's argument but rather makes clear that 18 U.S.C. § 922(k)'s prohibition on possessing a firearm with an obliterated serial number in the home violates the Second Amendment.  <u>District of Coumbia v. Heller</u>, 128 S.Ct. 2783, 2815-16 (2008).  To put the issue into the proper context, an extended quote from <u>Heller</u> is necessary.

> We may as well consider at this point (for we will have to consider eventually) *what* types of weapons <u>[United States v.] Miller</u> permits.  Read in isolation, <u>Miller's</u> phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected.  That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in <u>Miller</u>) might be unconstitutional, machineguns being useful in warfare in 1939.  We think that <u>Miller's</u> "ordinary military equipment" language must be read in tandem with what comes after: "[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." 307 U.S., at 179, 59 S.Ct. 816.  The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense.  "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same."  <u>State v. Kessler</u>, 289 Ore. 359, 368, 614 P.2d 94,

> 98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution
> 6-15, 252-254 )1973)).  Indeed, that is precisely the way in which the Second
> Amendment's operative clause furthers the purpose announced in its preface.
> We therefore read <u>Miller</u> to say only that the Second Amendment does not
> protect those weapons not typically possessed by law-abiding citizens for lawful
> purposes, such as short-barreled shotguns.  That accords with the historical
> understanding of the scope of the right, see Part III, <u>infra</u>.

<u>Heller</u>, 128 S.Ct. at 2815-16 (emphasis in original) (footnote omitted).  In Part III of the opinion

the Court states: "We have also recognized another important limitation on the right to keep and

carry arms.  <u>Miller</u> said, as we have explained, that the sorts of weapons protected were those in

common use at the time.  We think that limitation is fairly supported by the historical tradition

of prohibiting the carrying of 'dangerous and unusual weapons.'" <u>Id</u>. at 2817.

These excerpts from <u>Heller</u> make clear that small-arms without serial numbers are

protected by the Second Amendment as they were the exact type of weapons at the time the

Amendment was ratified that members of the militia were expected to have in their homes for

self-defense and therefore available for the militia members to bring with them when they

reported for militia service.  There was nothing "dangerous" or "unusual" about the firearms not

having a serial number because, as explained in Mr. Marzzarella's Motion to Dismiss, serial

numbers were not in use at the time the Second Amendment was ratified. Accordingly, by

definition, small-arms that do not have serial numbers are the **types** or **sorts** of weapons the

Second Amendment protects.  <u>Heller</u>, 128 S.Ct. at 2815, 2817 ("We may as well consider at this

point . . . *what* **types** of weapons <u>Miller</u> permits."  "<u>Miller</u> said, as we have explained, that the

**sorts** of weapons protected were those 'in common use at the time.'").

<u>Miller's</u> limitation on the types and sorts of weapons protected by the Second

Amendment comes into play when the weapon at issue is of a type or sort that did not exist at

the time the Second Amendment was ratified.  Weapons that were typically possessed at the time of the ratification, such as small-arms without serial numbers, are indisputably protected by the Second Amendment as it merely ratified the *pre-existing* common law right to possess these types of weapons.  Heller, 128 S.Ct. at 2797.

Nowhere in the government's response does it challenge Mr. Marzzarrella's account of the history of serial numbers and the fact that at the time the Second Amendment was adopted small-arms did not have serial numbers.  The government does not challenge this history because it cannot.  Rather than deal with the fact that Mr. Marzzarella's possession of a handgun in his home is the core activity protected by the Second Amendment, the government spends the majority of its time talking about how vital serial numbers are and how people who possess firearms without serial numbers are bad.  While this information may be useful in applying strict scrutiny to § 922(k), although as will be explained *infra* the government can not trace firearms using serial numbers the way it claims, it is irrelevant in determining the scope of a fundamental right enshrined in the Constitution even if the government wishes the right was not so enshrined. The Supreme Court explained in Heller

> The very enumeration of the right takes out of the hands of government–even the
> Third Branch of Government–the power to decide on a case-by-case basis
> whether the right is *really worth* insisting upon.  A constitutional guarantee
> subject to future judges' assessments of its usefulness is no constitutional
> guarantee at all.  Constitutional rights are enshrined with the scope they were
> understood to have when the people adopted them, whether or not future
> legislatures or (yes) even future judges think that scope too broad.

Heller, 128 S.Ct. at 2821 (emphasis in original).

<u>The Court Must Apply Strict Scrutiny In This Case</u>

It is impossible to read <u>Heller</u> and not conclude that when it comes to challenging a law

that infringes a law-abiding citizen's possession of a type of firearm covered by the Second Amendment in his home courts must apply strict scrutiny.  While the Court declined to explicitly state what level of scrutiny should be applied in every Second Amendment challenge to every law impacting the right to keep and bear arms, it emphatically made clear that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens **to use arms in defense of hearth and home**." Heller, 128 S.Ct. at 2821 (emphasis added).  This case involves a law-abiding, responsible citizen possessing arms in his home.  Mr. Marzzarella is not prohibited from possessing firearms.  Mr. Marzzarella possessed the firearm in question in his home, a fact the Supreme Court has expressly held is of the utmost importance, the government's protestations to the contrary not withstanding.  Mr. Marzzarella's right to engage in this conduct is elevated by the Second Amendment above all other interests.  The Supreme Court has long applied strict scrutiny when reviewing legislative judgments that interfere with fundamental constitutional rights.  San Antonio Indep. Sch. Dist. V. Rodriguez, 411 U.S. 1, 33, 93 S.Ct. 1278, 1287 (1973); See Adam Winkler, *Fatal in Theory and Strict in Fact: An Analysis of Strict Scrutiny in the Federal Courts*, 59 Vanderbilt L.Rev. 793 (2006).  A right is "fundamental" for strict scrutiny purposes if it is explicitly or implicitly guaranteed by the Constitution.  San Antonio Indep. Schl. Dist., 411 U.S. at 33, 93 S.Ct. 1297. The Supreme Court has never allowed a core, enumerated constitutional right to be restricted by anything less than a law that passed strict scrutiny.  The government's response to Mr. Marzzarella's Motion to Dismiss does not cite a single case in which the Supreme Court has failed to apply strict scrutiny to a statute that impacts a fundamental constitutional right.  Not one.  Its failure to do so speaks volumes.

The government's response argues for the application of "intermediate scrutiny" to § 922(k).  Gov. Response at 8.  But that argument is plainly wrong as intermediate scrutiny is the standard of review that applies to statutes that impact a "quasi-suspect" class such as gender or illegitimate children.  Erwin Chemerinsky, *Constitutional Law Principles and Policies*, at 645 (2nd Ed. 2002); Joseph O. Oluwole, Preston C. Green, *No Child Left Behind Act, Race, and Parents Involved*, 5 Hastings Race & Poverty L.J. 271, 296-97 (2008).  Intermediate scrutiny, as its name suggests, lies between strict scrutiny on the one hand when fundamental constitutional rights are involved, and rational basis review on the other hand when no constitutional rights are involved.  As the right to possess small-arms in the home is a fundamental right enshrined in the Constitution, strict scrutiny applies.

The cases relied upon by the government are completely unpersuasive in the attempt to avoid strict scrutiny.  United States v. Bledsoe, 2008 WL 3538717 (W.D. Tex. 2008) involved a challenge to 18 U.S.C. § 922(a)(6) which makes it unlawful "for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition . . . knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive [the seller] with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter."  As can readily be seen, this statute does not involve the possession of a firearm in the home for self-defense but rather the commercial sale of firearms. For that reason alone, it is of no use in this case.  Additionally, the district court's rejection of strict scrutiny is based on reasoning thoroughly rejected by the Supreme Court.

The district court rejected strict scrutiny analysis because it found that § 922(a)(6) dealt

with restrictions of constitutional rights rather than proscriptions of constitutional rights.  Id. at

*3.  This was so, according to the district court because "[t]he statutes used to indict Defendant

in no way proscribe gun possession generally among all people."  Id.  From this premise, and in

reliance on pre-Heller circuit precedent, the district court rejected strict scrutiny.  This rationale

has no basis in the Supreme Court's jurisprudence.  Statutes do not have to completely eliminate

a fundamental constitutional right before they are subject to strict scrutiny review.  To the

contrary, if a statute merely infringes the exercise of a fundamental right the statute is subject to

strict scrutiny.  Adam Winkler, *Fatal in Theory and Strict in Fact: An Analysis of Strict Scrutiny*

*in the Federal Courts*, 59 Vanderbilt L.Rev. 793, 801 (2006) (hereinafter "Winkler").   NAACP

v. Alabama, 357 U.S. 449, 78 S.Ct. 1163 (1958) makes the point nicely.

        In NAACP, the State of Alabama attempted to force the NAACP to produce a list of its

members living in Alabama.  Id. at 453, 1167.  The NAACP objected, arguing that the

production of the names of its members would infringe upon their fundamental right to associate

as past release of the information has exposed its members to economic reprisal, loss of

employment, threat of physical coercion, and other reprisals.  Id. at 462, 1172.  The Supreme

Court agreed stating: "We think that the production order, in the respects here drawn in

question, must be regarded as entailing the likelihood of a substantial restraint upon the exercise

by petitioner's members of their right to freedom of association."  Id.  The Court then turned "to

the final question whether Alabama has demonstrated an interest in obtaining the disclosures it

seeks from petitioner which is sufficient to justify the deterrent effect which we have concluded

these disclosures may well have on the free exercise by petitioner's members of their

constitutionally protected right of association.  Such a '* * * subordinating interest of the State

must be **compelling**," <u>Sweezy v. New Hampshire</u>, 354 U.S. 234, 265, 77 S.Ct. 1203, 1219, 1L.Ed.2d 1311 (concurring opinion)." <u>Id</u>. at 463, 1172.  Of course, governments must support the need for a challenged statute by establishing a compelling state interest when strict scrutiny is the standard.

Another prime example of the Supreme Court applying strict scrutiny to a statute that burdened but did not completely ban a fundamental constitutional right is <u>U.S. v. Playboy Entertainment Group, Inc.</u>, 529 U.S. 803, 120 S.Ct. 1878 (2000).  In that case, Congress had passed a law requiring cable television providers to block or scramble channels "primarily dedicated to sexually-oriented programming" except between 10:00 p.m. and 6:00 a.m.  <u>Id</u>. at 806, 1882.  The Supreme Court struck down the law after subjecting it to strict scrutiny because it was a content based restriction on speech.  In reaching this conclusion, the Supreme Court brushed off the argument that the statute did not totally ban channels primarily dedicated to sexually-oriented programming but merely restricted the hours to which those channels could be shown.  "It is of no moment that the statute does not impose a complete prohibition.  The distinction between laws burdening and laws banning speech is but a matter of degree.  The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans."  <u>Id</u>. at 812, 1886.  A more thorough repudiation of the <u>Bledsoe</u> court's reasoning could not hope to be found.  For further examples of where the Supreme Court has applied strict scrutiny to statutes that merely infringed fundamental constitutional rights rather than proscribed the exercise of the right completely see Winkler at 800-801.

As the above discussion establishes, <u>Bledsoe's</u> rejection of strict scrutiny because the statute at issue merely restricted the exercise of a fundamental right is patently wrong.  Indeed,

Heller itself rejected this tortured logic.  In support of its argument that the handgun ban was constitutional, the District argued that the law passed constitutional muster because it allowed the possession of long guns.  The Supreme Court derisively disposed of this argument stating "[i]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." Heller, 128 S.Ct. at 2818.

The government's reliance on United States v. Zaleski, 2008 WL4234419 (D.Conn. 2008) is not surprising but of little help to this Court.  Initially, it is worth noting that the defendant's motion in that case did not challenge the constitutionality of § 922(k) as the defendant had not been charged with violating that statute at the time his motion to dismiss was filed.  More importantly, the entirety of Zaleski's analysis of the constitutionality of § 922(k) is as follows: "Like the registration requirement, laws prohibiting the transportation and receiving of firearms from which the serial numbers have been removed or altered, such as 18 U.S.C. § 922(k), would pass any level of scrutiny since such requirements do nothing to limit lawful possession or use of a firearm."  That is not legal reasoning; it is defining away the problem.  It is no answer to a challenge that a statute is unconstitutional because it infringes a fundamental constitutional right to say that the statute is constitutional because the statute does not limit lawful activity because if you are violating the statute you are, by definition, not acting lawfully.

This analysis, such as it is, completely misses the point that the Constitution sets limits upon what laws Congress can pass.  When it comes to fundamental constitutional rights, which have been set forth in a Bill of Rights whose sole purpose was to ensure that Congress could not take those rights away from the people, the Supreme Court has insisted that any law passed by

Congress purporting to limit the right must pass strict scrutiny.  Anything less renders the guarantees of the Bill of Rights a nullity.  Heller, 128 S.Ct. at 2821 ("A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.  Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.").

Refusing to critically analyze a statute that limits the exercise of a fundamental constitutional right because the statute does not completely ban every aspect of the fundamental constitutional right subjects the exercise of that right to the approval of the government.  As mentioned above, the Supreme Court rejected this argument in Heller when it stated "[i]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."  Heller, 128 S.Ct. at 2818.  If this were not the case, Congress could pass a law forbidding anyone to exercise the Catholic faith and defend the law against a First Amendment free exercise challenge by saying that the law is not unconstitutional because the people are still free to exercise any other religion they may choose.  Furthermore, the government would be able to dismiss a citizen's actions in exercising the Catholic faith as "unlawful," and therefore not protected by the Constitution, because the law says practicing the Catholic faith is illegal.  This type of analysis makes rights reserved in a constitution meaningless.

The two circuit court cases relied upon by the government to establish the purpose behind § 922(k), United States v. Carter, 421 F.3d 909 (9th Cir. 2005) and United States v. Adams, 305 F3d 30 (1st Cir. 2002), have nothing to say about the constitutionality of § 922(k)

post Heller.  Carter is a guideline case and only discussed § 922(k) in an effort to shed light on the application of U.S.S.G. § 2K2.1(b)(4).  Adams did not involve a challenge to the constitutionality of § 922(k) but rather a challenge to the sufficiency of the jury instructions given on a § 922(k) charge.  Accordingly, neither Carter nor Adams is of any benefit to the government.

Finally, the Supreme Court's finding that the District of Columbia's total ban on handguns violated the Second Amendment does not mean that any limitation less than a total ban on the possession of handguns automatically passes constitutional muster.  Courts decide the issue that is before them in a specific case.  Heller dealt with a statute that the Supreme Court found amounted to a total ban on handgun possession in the home.  Once the Court found that the Second Amendment established an individual right to possess on type of small-arms (handguns) in the home, it was clear that the statute had to be found unconstitutional.  Because the Court did not have to resolve the proper standard of review for every challenge to every gun law, it did not.  That is not unusual.  That does not mean that any statute that limits the right to possess small-arms in the home but does not amount to a total ban on possessing small-arms in the home is constitutional.  The statute at issue in Heller did not amount to a complete ban on all small-arms in the home.  It allowed the possession of long-guns, i.e. rifles and shotguns, which are classic small-arms.  This did not save the ban on the possession of handguns.  Under the rationale used in Zaleski and Bledsoe, the Supreme Court should have upheld the District's handgun ban because it did not completely ban the lawful possession of firearms.  The Supreme Court rightfully rejected this frivolous argument.

<u>Section 922(k) Does Not Survive Strict Scrutiny</u>

The Supreme Court's strict scrutiny jurisprudence began with <u>United States v. Carolene Products Co.</u>, 304 U.S. 144, 152, n.4, 58 S.Ct. 778, 783, n.4 (1938).  Winkler, at 798.  <u>Caroline Products's</u> footnote four suggested for the first time that the scope of review would be narrower than the rational basis test "when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments . . . ."  <u>Id</u>.  The Supreme Court cited to <u>Carole Products</u> in <u>Heller</u> to reject the notion that the District's ban on handgun possession could be subject to mere rational basis review.  <u>Heller</u>, 128 S.Ct. at 2817-2818, n.27.

> The "more searching" scrutiny proposed in Carolene Products invoked an unusual starting presumption for courts to take in a limited set of controversies. Whereas separation of powers and federalism concerns ordinarily lead courts to presume that legislatures act within their powers and that legislation is constitutionally valid, footnote four implied an alternative course in core rights and discrimination cases. With laws encroaching upon these rights, the "ordinary political processes" could not be trusted to reach constitutionally legitimate results.  Thus, courts should reverse their usual starting point by presuming such laws to be unconstitutional and require the government to bear the burden of defending the law.

Winkler at 802.  The Supreme Court has applied strict scrutiny review to laws impacting the freedom of speech, the right to peaceably assemble, the freedom of equal protection under the law, the right to vote, the right to travel, the freedom to exercise religion, and the right to procreate.  <u>Id</u>.at 799-801 citing cases (footnotes omitted).

To survive strict scrutiny the law at issue must further a compelling interest, see <u>NAACP</u>, 357 U.S. at 463, 78 S.Ct. at 1172, and do so in a narrowly tailored manner.  "Narrow tailoring requires that the law capture within its reach no more activity (or less) than is necessary

to advance those compelling ends. An alternative phrasing is that the law must be the 'least

restrictive alternative' available to pursue those ends.  This inquiry into 'fit' between the ends

and the means enables courts to test the sincerity of the government's claimed objective."

Winkler at 800-01.  "[C]ourts use narrow tailoring to police against means that are overinclusive

or underinclusive. A law with poor fit--one that does not capture all like threats--suggests that ."

Id. at 803.  See also Eugene Volokh, *Freedom of Speech, Permissible Tailoring and*

*Transcending Strict Scrutiny*, 144 U. Pa. L. Rev. 2417, 2420 (1996) ("A law's

underinclusiveness--its failure to reach all speech that implicates the interest--may be evidence

that an interest is not compelling, because it suggests that the government itself doesn't see the

interest as compelling enough to justify a broader statute.").

The government claims that the compelling government interest supporting § 922(k) are

"[p]ublic safety concerns" which are advanced by § 922(k) because "prohibiting the possession

of firearms with obliterated serial numbers assists law enforcement authorities in firearms

tracing and combating the increasing prevalence of crime."  Gov. Response, pp. 8-9.  Combating

crime is a legitimate governmental issue.  The problem with § 922(k) is that it is not narrowly

tailored to achieve the government's stated goals.  The statute is both underinclusive because it

does not require the creation and retention of serial number data which would allow the

government to effectively trace firearms by serial number, and overinclusive because it applies

to conduct that does not prevent the government from engaging in serial number tracing because

the serial number, even if defaced, can be ascertained through various methods.

Section 922(k) is underinclusive.

The government's response, along with court opinions that discuss tracing firearms

through the use of serial numbers, gives the impression that a serial number trace can reveal the

firearm's origin and transfers in ownership from the time the firearm was manufactured through

the final owner of the firearm.  See United States v. Adams, 305 F.3d 30, 34 (1st Cir. 2002) ("the

statute aims to punish one who possesses a firearm whose principal means of tracing origin and

transfers in ownership–its serial number–has been deleted or made appreciably more difficult to

make out").  This is **false**.

The most a serial number trace can accomplish is to trace "the movement of a firearm

from the first sale by the manufacturer or importer through the distribution chain

(wholesaler/retailer) **to the first retail purchaser**."  ATF Publication 3312.9 (emphasis added),

attached as Defendant's Exhibit A.  Indeed, just this year Congress found that "[t]racing studies

conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives are released without

adequate disclaimers regarding the limitations of the data."  Public L. No. 110-161,

Consolidated Appropriations Act of 2008, § 518(a).  In response to this concern, Congress took

the following action

> (b) The Bureau of Alcohol, Tobacco, Firearms and Explosives shall include in all
> such data releases, language similar to the following that would make clear that
> trace data cannot be used to draw broad conclusions about firearms-related
> crime:
>
> (1) Firearm traces are designed to assist law enforcement authorities in
> conducting investigations by tracking the sale and possession of specific
> firearms. Law enforcement agencies may request firearms traces for any reason,
> and those reasons are not necessarily reported to the Federal Government. Not all
> firearms used in crime are traced and not all firearms traced are used in crime.
>
> (2) Firearms selected for tracing are not chosen for purposes of determining
> which types, makes, or models of firearms are used for illicit purposes. The
> firearms selected do not constitute a random sample and should not be
> considered representative of the larger universe of all firearms used by criminals,

14

or any subset of that universe. **Firearms are normally traced to the first retail seller**, and sources reported for firearms traced do not necessarily represent the sources or methods by which firearms in general are acquired for use in crime.

Pub.L.No. 110-161, Consolidated Appropriations Act of 2008, § 518(b) (emphasis added).  The belief that serial numbers allow the government to trace transfers of ownership past the first retail purchaser is a myth.

Due to the limitations of serial number traces to the first retail purchaser, the ATF itself has admitted that "[b]ecause tracing a firearm generally requires an unbroken chain of dispositions from manufacturer to first retail purchaser, used guns . . . **have rarely been traceable.**"  GUN SHOWS: Brady Checks and Crime Gun Traces p, 7 n.18 available at www.atf.gov/pub/treas_pub/gun_show.pdf.  The reason that serial number traces normally lead only to the first retail seller is that only Federal firearms licensees (FFLs) are required to produce and keep any records of firearms sales.  A private party may sell a firearm to another private party within the same state without having to engage in any type of paperwork or record keeping.  See www.atf.gov/firearms/faq/faq2.htm#b1.  Several studies have concluded that, roughly, at least half of all firearms are purchased used, in the secondary market where no recording keeping is required.  George D. Newton & Franklin E. Zimring, Firearms and Violence in American Life 13 (Nat'l Comm'n on the Causes & Prevention of Violence, Staff Report, 1963) (in 1968 54% of handguns purchased used, 46% of shotguns purchased used, 44% of rifles purchased used); Philip J. Cood, Stephanie Molliconi, and Thomas B. Cole, Regulating Gun Markets, 86 J. Crim. L. & Criminology, 59, 70 (1995) (estimating that half of gun purchases each year are used guns purchased in the secondary market).

Many firearms cannot even be traced to the original retail purchaser.  The first time retail

sellers of firearms were required to keep any records of firearms sales was pursuant to the
Federal Firearms Act of 1938.  Franklin E. Zimring, Firearms and Federal Law: The Gun
Control Act of 1968, p. 4 available at www.saf.org/LawReviews/Ximring68.htm.  The Federally
licensed dealers were required to keep records for six years.  Id. at 5.  Prior to July 1, 1958,
manufacturers of firearms were not required by law to place serial numbers on firearms  23 F.R.
343 (Jan. 18, 1958); George D. Newton & Franklin E. Zimring, Firearms and Violence in
American Life 102 (Nat'l Comm'n on the Causes & Prevention of Violence, Staff Report,
1963).  At the same time manufacturers were required to place serial numbers on firearms the
requirement of keeping records for six years was changed to a requirement that they be kept for
ten years.  Id.  Those same regulations required for the first time that the records kept by gun
dealers include the serial number of each gun sold.  See Defendant's Exhibit B.  Under current
law, FFL's are allowed to destroy all records of guns sales that occurred prior to December 16,
1968, and must keep records of gun sales after that for a period of twenty years.  27 CFR §
478.129(a) -(e).  Accordingly, at this point in time, no records regarding the sale of firearms by
FFLs are required to be kept for firearms sold prior to November 1988.  Attempts to trace
firearms by serial number for a firearm sold before November 1988 will be pointless.

So, while the government claims that it has such a compelling need to be able to trace
the ownership of firearms through the use of serial numbers that it can entrench upon an
enumerated constitutional right, in reality the government does not actually require the
documentation that would be necessary for it to achieve its stated goal.  This case is a perfect
example.  Attached as Defendant's Exhibit C is a report from ATF Special Agent Mark J.
Willgohs containing his opinion that the .25 caliber Titan handgun at issue in this case was

manufactured either by Titan Manufacturing Corporation in Florida or by Tangfoglio In Italy for Titan.  The report claims that Titan produced .25 caliber pistols with the "B" prefix in the serial number from 1968 to 1970.  Noticeably absent from the report is any information specific to the particular gun at issue that was gathered from a trace of the serial number on the gun.  Defense counsel has requested the results of any serial number trace performed on the firearm but as of yet has not received a response from the government.  Given that the gun at issue was manufactured 38 to 40 years ago, it is highly unlikely that a serial number trace provided **any** information.

For the government to be able to actually trace gun ownership by use of the gun's serial number it would have to do two things that it does not now do: 1) require any person who transfers a firearm to create a record of that transaction, including the serial number of the firearm, and provide that record to the ATF; and 2) require the ATF to keep the records permanently.  Absent these requirements, a serial number trace is of extremely limited value.  It surely cannot satisfy the government's stated interest in discovering the ownership of the firearm being traced.  Such a system would not be difficult to create and maintain as such a system already exists for motor vehicles.  If every motor vehicle in this country can be registered and its ownership tracked through each purchaser, whether the purchase is made through a dealer or a private citizen, by VIN number, surely the same could be done for firearms.  The fact that the government has not created such a system to allow the tracking of firearms by serial number beyond the first retail purchaser shows that the government itself does not really believe that the need to be able to trace firearms by serial number is compelling.

Given the severe limitations on what information can be obtained based upon a serial

number trace, § 922(k) is not narrowly tailored to achieve the government's stated interest of
"discourag[ing] the use of untraceable weaponry." Gov. Response p. 9.  Any weapon purchased
over twenty years ago is untraceable weaponry regardless of whether it does or does not have a
serial number.  Furthermore, any firearm that has passed from the possession of the first retail
purchaser is untraceable weaponry regardless of whether it does or does not have a serial
number.  GUN SHOWS: Brady Checks and Crime Gun Traces p, 7 n.18 (used guns . . . **have
rarely been traceable**")  available at www.atf.gov/pub/treas_pub/gun_show.pdf.  Accordingly,
§ 922(k) is underinclusive, because it reaches far less activity than would be necessary to
advance the government's claimed compelling need to trace firearms.

The Supreme Court discussed the underinclusiveness issue in The Florida Star v. B.J.F.,
491 U.S. 524, 109 S.Ct. 2603 (1989).  In that case, a rape victim sued a Florida newspaper for
publishing her name when reporting on the crime in violation of a  Florida statute making it
unlawful to publish "in any instrument of mass communication" the name of the victim of a
sexual offense.  Id. at 527-28, 2605-06.   The newspaper challenged the constitutionality of the
statute on First Amendment grounds but the Florida courts rejected the challenge, claiming that
a rape victim's name was a private matter not to be published as a matter of law.  The Supreme
Court disagreed, finding the Florida statute violated the First Amendment in part because it was
narrowly tailored to achieve the stated goal of preventing the dissemination of a rape victim's
name.

Because the Florida statute dealt with a fundamental constitutional right, freedom of the
press, the Court found that a state could not punish the publication of truthful information
lawfully obtained "absent a need to further a state interest of the highest order."  Id. at 533, 2609

(quoting <u>Smith v. Daily Mail Publishing Co.</u>, 443 U.S. 97, 103, 99 S.Ct. 2667, 2671 (1979)).  In finding that Florida had not met this standard, the Supreme Court stated "the facial underinclusiveness of [the statute] raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which appellee invokes in support of affirmance."  <u>Id</u>. at 540, 2612.  The Court noted that the statute only prohibited the dissemination of the rape victim's name by "instrument of mass communication" but did not apply to an individual who disseminated the rape victim's name to persons who live near or work with the victim.  The Court explained

> When a State attempts the extraordinary measure of punishing truthful publication in the name of privacy, it must demonstrate its commitment to advancing this interest by applying its prohibition evenhandedly, to the smalltime disseminator as well as the media giant. * * *  Without more careful and inclusive precautions against alternative forms of dissemination, we cannot conclude that Florida's selective ban on publication by the mass media satisfactorily accomplishes its stated purpose.

<u>Id</u>. at 541, 2613.  As Justice Scalia explained in his concurring opinion, "a law cannot be regarded as protecting an interest 'of the highest order,' and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited."  <u>Id</u>. at 541-42, 2613 (Scalia, J., concurring).

In <u>United States v. Stevens</u>, 533 F.3d 218, 220 (3rd Cir. 20080 (en banc), the Third Circuit found 18 U.S.C. § 48 an unconstitutional infringement on free speech rights guaranteed by the First Amendment.  Section 48 made it unlawful to create, sell or possess a depiction of animal cruelty with the intention of placing that depiction in interstate or foreign commerce for commercial gain.  The term "depiction of animal cruelty" was defined as "any visual or auditory depiction, including any photograph, motion-picture film, video recording, electronic image, or

19

sound recording of conduct in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed, if such conduct is illegal under Federal law or the law of the State in which the creation, sale, or possession takes place, regardless of whether the maiming, mutilation, torture, wounding, or killing took place in the State." Because § 48 addressed depictions of animal cruelty rather than the actual acts of animal cruelty depicted, the Third Circuit found that the statute restricted speech. Id at 223. After rejecting the government's argument that depictions of animal cruelty were categorically unprotected speech, like child pornography, and, therefore, not subject to First Amendment protection, the Third Circuit acknowledged that § 48 had to pass strict scrutiny as a restriction on free speech. Id. at 232. The government claimed that § 48 survived strict scrutiny because the goal of the statute, preventing cruelty to animals, was compelling. Id. at 233. The Third Circuit disagreed, finding that if preventing cruelty to animals was the compelling government interest behind § 48 the statute was not narrowly tailored to achieve that goal. One reason § 48 was not narrowly tailored was that it was underinclusive. The Third Circuit noted that the statute did not prohibit any depictions of animal cruelty which were made solely for personal use. Id.

Just as the statutes at issue in B.J.F., and Stevens were underinclusive, § 922(k) is underinclusive. Section 922(k) cannot be regarded as protecting an interest of the highest order, allowing the government to determine gun ownership by serial number tracing, when it leaves appreciable damage to that supposedly vital interest unprohibited.

§ 922(k) is overinclusive.

If the compelling government interest justifying § 922(k) is to discourage the use of untraceable weaponry so that law enforcement can trace firearms, such as they can, through the

use of serial numbers, the statute is overinclusive.  Section 922(k) applies even when law enforcement can identify the altered or obliterated serial number through various laboratory procedures such as microscopy.  In this case the ATF laboratory was able to identify the serial number on the Titan .25 caliber pistol with simple, standard laboratory techniques.  Accordingly, § 922(k) criminalizes conduct that does not prevent the government from performing serial number tracing.  This makes § 922(k) overinclusive.

The Third Circuit discussed overinclusiveness in <u>Stevens</u>.  In finding that § 48 did not meet strict scrutiny because it was not narrowly tailored to achieve the government's interest in preventing acts of animal cruelty, the court found that in addition to the statute being underinclusive as discussed above it was also overinclusive.  The statute was overinclusive because it allowed the prosecution of a defendant who sold a depiction of animal cruelty in Pennsylvania made in Virginia even if the underlying activity was legal in Virginia but illegal in Pennsylvania.  <u>Id</u>.  Obviously, criminalizing the possession of a "depiction of animal cruelty" which was made in a state in which the underlying acts are not considered animal cruelty cannot further the interest of avoiding animal cruelty.  Likewise in this case, § 922(k) cannot further the government's interest in being able to perform serial number traces on firearms by criminalizing conduct that does not prevent the government from being able to perform serial number traces.  The overinclusiveness of § 922(k) could be cured only if, in addition to the data retention requirements discussed above, the statute only applied when the serial number in question has been completely obliterated and cannot be identified even through the use of laboratory procedures.

<u>Conclusion</u>

Mr. Marzzarella has a constitutionally protected right to possess small-arms without serial numbers.  Title 18 U.S.C. § 922(k) burdens that right.  The government has failed to overcome the presumption that the statue is unconstitutional as it has failed to establish that § 922(k) is narrowly tailored to achieve the government's claimed compelling need to trace firearms.  Accordingly, this Court must find § 922(k) unconstitutional as applied in this case and dismiss the indictment.

Respectfully submitted,


<u>/s/ Thomas W. Patton</u>
Thomas W. Patton
Assistant Federal Public Defender
PA State ID # 88653