IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
    v. )   Criminal No. 07-24 Erie
)
MICHAEL P. MARZZARELLA )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.

    Defendant is charged in a one-count indictment with knowingly possessing a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k).[1] The government alleges that, in April of 2006, officers of the Pennsylvania State Police received information from a confidential informant that the Defendant was involved in gun trafficking in and around Meadville, Pennsylvania and that the Defendant possessed a firearm with an obliterated serial number. According to the government, an undercover Pennsylvania State Trooper accompanied the confidential informant to the Defendant's apartment on April 26, 2006, where the Defendant sold the undercover officer a .25 caliber titan pistol with a partially obliterated serial number. It is alleged that this same undercover officer purchased a second firearm from the Defendant on May 16, 2006, at which time the Defendant informed the officer that the serial number on the second firearm could be obliterated in a similar fashion.

    Defendant now moves this Court to dismiss the Indictment on the ground that

---

[1] That provision states:

It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(k).

the charge against him infringes his Second Amendment rights. For the reasons set forth below, Defendant's motion will be denied.

## DISCUSSION [2]

The Second Amendment to the United States Constitution provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. AMEND. II.

In *District of Columbia v. Heller*, — U.S. —, 128 S. Ct. 2783 (2008), the Supreme Court clarified that the Second Amendment protects an individual right to possess a firearm unconnected with service in a militia. In *Heller*, the Court struck down a District of Columbia law which essentially banned handgun possession and required that other types of firearms (such as long guns) be rendered inoperable for immediate use within the home. The challenged law, as described by the Supreme Court:

> generally prohibits the possession of handguns. It is a crime to carry an unregistered firearm, and the registration of handguns is prohibited. *See* D.C. Code §§ 7-2501.01(12), 7-2502.01(a), 7-2502.02(a)(4) (2001). Wholly apart from that prohibition, no person may carry a handgun without a license, but the chief of police may issue licenses for 1-year periods. *See* §§ 22-4504(a), 22-4506. District of Columbia law also requires residents to keep their lawfully owned firearms, such as registered long guns, "unloaded and dissembled or bound by a trigger lock or similar device" unless they are located in a place of business or are being used for lawful recreational activities. *See* § 7-2507.02.[ ]

---

[2] Under the Federal Rules of Criminal Procedure, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense. *See United States v. Hurst,* No. CRIM.A.04-94-1, 2004 WL 2810064, at *1 (E.D. Pa. Nov. 30, 2004) (citing Fed. R. Crim. P 12(b)(3)(B)). "'In order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating.'" *United States v. Zauber*, 857 F.2d 137, 144 (3d Cir.1988) (quoting *United States v. Gimbel*, 830 F.2d 621, 624 (7th Cir.1987)). In considering a motion to dismiss an indictment or a portion of an indictment, the court accepts as true the well-pleaded factual allegations set forth in the indictment. *See United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir.1990). If the facts do not constitute a violation of federal law, the charges should be dismissed. *United States v. Gambone*, 125 F. Supp.2d 128, 131 (E.D. Pa. 2000).

2

128 S. Ct. at 2788 (footnote omitted). The Court ruled that these provisions violated the Second Amendment as applied to the Respondent, a D.C. special police officer who wished to keep an operable firearm in his home for purposes of self-defense.

Based on *Heller*, Defendant argues that 18 U.S.C. § 922(k), as applied to his case, is unconstitutional. He asserts that, under Heller, "[t]he core right of the Second Amendment is the private possession of firearms for use in defense of hearth and home" and "[t]he only limitations on the right to keep and bear arms identified by the Court were those limitations in effect at the time of the enactment of the Second Amendment." (Def.'s Mot. to Dismiss Indictment [60] at p. 4.) Because serial numbers had not yet come into use at the time of the Second Amendment's enactment, there were no laws extant in 1787 requiring serial markings on firearms. Defendant thus theorizes that:

> [s]ince possession of a handgun with an obliterated serial number was not proscribed under the common law, and therefore not an exception to the right to keep and bear arms codified by the Second Amendment, § 922(k), as applied to this case, purports to outlaw the otherwise lawful possession of a handgun by a citizen in his home.

(*Id*. at p. 7.)

Defendant further theorizes that the right to possess an unmarked handgun is a fundamental constitutional right, such that any government regulation burdening the right must be subjected to strict scrutiny. In Defendant's view, § 922(k) cannot meet the demands of strict scrutiny and, thus, he concludes, the indictment charging him under that statute must be dismissed.

Since the Supreme Court issued its opinion in *Heller* nearly seven months ago, numerous defendants prosecuted under the federal firearms laws have challenged their criminal proceedings on Second Amendment grounds. Notably, Defendant cites no case in which § 922(k) – or any other subsection of § 922, for that matter – has been found invalid. On the contrary, it appears that every court which has considered a Second Amendment challenge to 18 U.S.C. § 922, post-*Heller*, has upheld the statute

3

as constitutional. *See, e.g., United States v. Frazier*, No. 07-6135, 2008 WL 4949153 (6th Cir. Nov. 19, 2008) (Second Amendment challenge to § 922(g)(1)); *U.S. v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) (§ 922(o)); *United States v. Gilbert*, No. 07-30153, 2008 WL 2740453, at *2 (9th Cir. July 15, 2008) (explaining that *Heller* did not undermine the restrictions contained in 18 U.S.C. §§ 922(g)(1) and 922(o)); *United States v. Chafin*, Criminal Action No. 2:08-00129, 2008 WL 4951028 (S.D. W. Va. Nov. 18, 2008) (rejecting challenge to §§ 922(d)(3) and (g)(3)); *United States v. Luedtke*, No. 08-CR-189, 2008 WL 4951139, at *4-6 (E.D. Wis. Nov. 18, 2008) (§ 922(g)(8)); *United States v. Borgo*, No. 1:08CR81, 2008 WL 4631422, at *2 (W.D.N.C. Oct. 17, 2008) (§ 922(g)(1)); *United States v. Li*, No. 08-CR-212, 2008 WL 4610318, at *6 (E.D. Wis. Oct. 15, 2008) (§ 922(g)(9)); *United States v. Chester*, Criminal Action No. 2:08-00105, 2008 WL 4534210, at *2 (S.D. W. Va. Oct. 7, 2008) (§ 922(g)(9)); *United States v. Erwin*, No. 1:07-CR-556 (LEK), 2008 WL 4534058 (N.D.N.Y. Oct. 6, 2008) (§ 922(g)(8)); *United States v. Yancey*, No. 08-cr-103-bbc, 2008 WL 4534201 (W.D. Wis. Oct. 3, 2008) (§ 922(g)(3)); *U.S. v. Whisnant,* No. 3:07-CR-32, 2008 WL 4500118, at *1 (E.D. Tenn. Sept. 30, 2008) (§ 922(g)(1)); *United States v. Solis-Gonzalez*, No. 3:08-CR-145-MR-DCK-1, 2008 WL 4539663 (W.D.N.C. Sept. 26, 2008) (§ 922(g)(5)); *LaRoche v. United States*, Nos. CV 407-054, CR 402-234, 2008 WL 4222081, at *2 (S.D. Ga. Sept. 15, 2008) (§ 922(j)) (challenge brought under 28 U.S.C. § 2255); *United States v. Knight*, 574 F. Supp. 2d 224, 226 (D. Me. Sept. 4, 2008) (§ 922(g)(8)); *United States v. Skoien*, No. 08-cr-12-bbc, 2008 WL 4682598, at *1 (W.D. Wis. Aug. 27, 2008) (§ 922(g)(9)); *United States v. Loveland*, No. 1:08CR54, 2008 WL 3925271, at *2 (W.D.N.C. Aug. 21, 2008) (§ 922(g)(1)); *United States v. Booker*, 570 F. Supp. 2d 161, 162-65 (D. Me. 2008) (§ 922(g)(9)); *United States v. Bledsoe*, Criminal No. SA-08-CR-13(2)-XR, 2008 WL 3538717 (W.D. Tex. Aug. 8, 2008) (§ 922(a)(6)); *United States v. White*, Criminal No. 07-00361-WS, 2008 WL 3211298, at *1 (S.D. Ala. Aug. 6, 2008) (§ 922(g)(9)); *United States v. Robinson*, 2008 WL 2937742, *2 (E.D. Wis. July 23, 2008) (§ 922(g)(1)); *United States v. Walters*, 2008 WL 2740398, *1 (D.V.I. July 15,

2008) (§ 922(q)(2)(A)); *United States v. Lewis*, Criminal No. 2008-21, 2008 WL 2625633 (D.V.I. July 3, 2008) (§ 922(k)).

I likewise conclude that nothing in *Heller* invalidates the specific provision of § 922 that is being challenged in this case. Fundamentally, *Heller* must be viewed in its proper perspective and distinguished from the case before me.

It must be noted at the outset that the regulations which *Heller* struck down were far broader in scope than the restriction imposed by § 922(k). As described by the *Heller* Court, the D.C. law "totally ban[ned] handgun possession in the home" and "also require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." 128 S. Ct. at 2817. The Court noted that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's hand-gun ban." *Id*. at 2818. The law amounted, in the Court's words, "to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense, *id*. at 2817 – a right which the Court considered "inherent" and "central" to the Second Amendment's protection. *Id*. Moreover, the prohibition extended to the home, where, the Court observed, "the need for defense of self, family, and property is most acute." *Id*. In light of these rather extreme circumstances, the Court concluded that the D.C. law would be unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id*. (footnote omitted).

The regulation at issue here imposes a burden on gun ownership that is practically negligible when compared to the District of Columbia's complete ban on operable firearms within the home. In relevant part, § 922(k) merely prohibits individuals from possessing a firearm if the individual has knowledge that the firearm's serial number has been obliterated, removed or altered. Since firearms with intact serial numbers are the norm and are readily available in our society through ordinary commercial channels, it cannot be said that § 922(k) meaningfully burdens the "core" Second Amendment right recognized in *Heller* – i.e., possession of an operable firearm

5

for purposes of self-defense within the home.[3]

Defendant attempts to liken this case to *Heller* by characterizing § 922(k) as a "complete ban on possessing a handgun that has an altered or obliterated serial number" (Def.'s Mot. to Dismiss Indictment [60] at p. 5 of 9), but the comparison is flawed. Firearms lacking serial numbers cannot be equated to "an entire class of 'arms' that is overwhelming chosen by American society for [the] lawful purpose" of self-defense, 128 S. Ct. at 2817. Whereas *Heller* can be read as recognizing a limited constitutional right for individuals to possess handguns, there is no recognized constitutional right, even under *Heller*, to own a handgun with an obliterated serial mark. Thus, the differences in terms of the both the nature and the scope of the regulation at issue here versus the regulation at issue in *Heller* are so fundamental as to make *Heller* factually inapposite to this case.

*Heller* may also be inapposite for another reason. Defendant claims that he is being prosecuted for engaging in "the very core conduct protected by the Second Amendment" (Def.'s Mot. to Dismiss, *supra*, at p. 5 of 9.), but the "core" Second Amendment right recognized by *Heller*, as Defendant himself admits, is the right to possess a firearm "for use in defense of hearth and home." (*Id*. at p. 4.) Here, the evidence allegedly will show that the Defendant was trafficking in firearms and that he sold the subject firearm to an undercover law enforcement officer. The Defendant's possession of a firearm in connection with its private sale to another is inherently inconsistent with an intention to possess the firearm for defense of the Defendant's home, since the Defendant cannot protect himself with a weapon that he sells away.

As the *Heller* Court made clear, the right to bear arms under the Second Amendment is not unconditional:

---

[3] In fact, the only individuals who are appreciably burdened by § 922(k) are those individuals who have a specific interest in owning a firearm with an obliterated serial number. As is discussed *infra*, the only reason for obliterating a firearm's serial number is to render the firearm "anonymous" and untraceable – a trait that is likely useful only to those who would use the firearm for illicit purposes.

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. ... For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. ... Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms. [ ]

128 S. Ct. at 2816-2817 (internal citations omitted) (footnote omitted). In a follow-up footnote, the Court expressly advised that these "presumptively lawful regulatory measures" were merely exemplary, not exhaustive. *Id*. at 2817 n. 26.

Defendant acknowledges that the right to bear arms is not without limits, but he interprets the foregoing language as indicating that the only limitations on Second Amendment rights are those that were in effect at the time of the Second Amendment's enactment.[4] The corollary to this assertion is that any mode or manner of possessing a firearm that was *not* expressly prohibited in 1787 should be viewed as a fundamental

---

[4] To support this assertion Defendant cites the majority's observation that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislature or (yes) even future judges think the scope too broad." (Def.'s Mot. [60] to Dismiss the Indictment at p. 4 (citing *Heller*, 128 S. Ct. at 2821).) However, that sentence appears in the context of the majority's rejection of Justice Breyer's proposed standard of review for Second Amendment cases. The quoted sentence relates to the majority's criticism of what it perceived as Justice Breyer's "judge-empowering 'interest-balancing inquiry,'" which, as the majority interpreted it, would grant government the "power to decide on a case-by-case basis whether the right is *really worth* insisting upon." 128 S. Ct. at 2821 (emphasis in the original). In stating that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," the majority was not insinuating that all modern-day gun regulations necessarily offend the constitution; rather, it was expressing reluctance to adopt a standard of review which might empower government officials to reduce the scope of the constitutional right itself based on a normative judgment that the constitutional right is no longer important enough, under current social mores, to honor.

7

constitutional right and any infringements thereof should be considered presumptively unconstitutional.

In this regard I think the Defendant reads too much into *Heller*. It is clear from the majority's language that it was disavowing any effort to establish definitive boundaries on the scope of the Second Amendment's protection. In addition, the majority made clear in footnote 26 that the "presumptively lawful regulatory" measures which it had identified were merely exemplary and not exhaustive. In my view, the majority's language, cited above, should not be read as implying that all modern-day gun regulations are presumptively unconstitutional. *See Luedtke*, 2008 WL 4951139 at *2 ("[N]othing in *Heller* suggests that the Court intended to permit only those *precise* regulations accepted at the founding. Rather, the Court's examples are best understood as representing the *types* of regulations that pass constitutional muster.") (citation omitted) (emphasis in the original).

In any event, it is worth considering that among the types of regulations which the Court implicitly sanctioned were "laws imposing conditions and qualifications on the commercial sale of arms" and "prohibitions on the possession of firearms by felons and the mentally ill," 128 S. Ct. at 2816-17. The latter type of restriction is directed at "keep[ing] firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n. 6 (1983) (discussing Congress' intent in enacting 18 U.S.C. § 922(g), which codifies similar prohibitions), *superseded in non-relevant part by statute, as recognized in U.S. v. Balascsak*, 873 F.2d 673, 677 (3d Cir. 1989).

Section 922(k) is one aspect of a broad statutory scheme designed both to regulate the commercial sale of firearms *and* to keep them out of the hands of those individuals who are considered dangerous. The provision, as originally enacted, was part of the Federal Firearms Act of 1938, an Act expressly designed "[t]o regulate commerce in firearms." Pub.L. No. 785, 52 Stat. 1250. By this Act, Congress intended "to prevent the crook and gangster, racketeer and fugitive from justice from being able

to purchase or in any way come in contact with firearms of any kind." S. Rep. No. 1189, 75th Cong. 1st, Sess., 33 (1937) (quoted in *Barrett v. United States*, 423 U.S. 212, 220 (1976)). Section 2(i) of the Federal Firearms Act made it unlawful "for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered." *Id*. at § 2(i), 52 Stat. 1251.

When Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, 82 Stat. 197, the provision was incorporated into Title IV of the Act and codified at 18 U.S.C. § 922(i).[5] Within months, Title IV was amended by Congress' enactment of the Gun Control Act of 1968, Pub.L. No. 90-618, 82 Stat. 1213 (1968), which expanded upon Title IV's regulations and re-codified § 922(i) at §922(k).[6] *See id*. at § 922(k), 82 Stat. 1221.

The goal of the Gun Control Act was "not ... merely to restrict interstate sales" of firearms but, more broadly, "to keep firearms away from persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). To achieve this goal, Congress put in place "a comprehensive scheme to

---

[5] The wording was amended slightly to read:

It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm the importer's or manufacturer's serial number of which has been removed, obliterated, or altered.

Pub. L. No. 90-351, § 922(i), 82 Stat. 231.

[6] The wording was once again slightly modified to read:

It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered.

Pub. L. No. 90-618, § 922(k), 82 Stat. 1221.

9

regulate the movement of firearms." *United States v. Mobley*, 956 F.2d 450, 453 (3d Cir. 1992). Thus,

> [c]ommerce in firearms is channeled through federally licensed importers, manufacturers, and dealers in an attempt to halt mail-order and interstate consumer traffic in these weapons. The principal agent of federal enforcement is the dealer. He is licensed, §§ 922(a)(1) and 923(a); he is required to keep records of 'sale . . . or other disposition,' § 923(g); and he is subject to a criminal penalty for disposing of a weapon contrary to the provisions of the Act, § 924.

*See Huddleston v. United States*, 415 U.S. 814, 824 (1974). By channeling the sales of firearms through federally licensed dealers, the Act sought to "insure that, in the course of sales or other dispositions by these dealers, weapons could not be obtained by individuals whose possession of them would be contrary to the public interest." *Huddleston*, 415 U.S. at 825.

Section 922(k)'s proscription against dealing in firearms with obliterated serial numbers serves these broad purposes. As our circuit court of appeals has observed:

> the trade in guns is monitored for a reason. Registration and verification procedures are imposed largely to combat crime. It is no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes. When a firearm is stolen, determining this chain is difficult and when serial numbers are obliterated, it is virtually impossible. Therefore, stolen or altered firearms in the hands of people recognized as irresponsible pose great dangers...

*Mobley*, 956 F.2d at 454. As a matter of common sense, untraceable firearms are of no particular use to the ordinary law-abiding citizen who intends to possess the firearm for common lawful purposes (such as defense of hearth and home). Rather, such weapons hold special value only for those individuals who intend to use them for unlawful activity. *See United States v. Carter*, 421 F.3d 909, 910 (9th Cir. 2005) (noting the district court's observation that weapons which have the appearance of being untraceable "have a greater street value ... or a greater flexibility to be utilized in (il)licit activities") (discussing and applying the sentencing enhancement at U.S.S.G. § 2K2.1(b)(4) relative to possession of firearms with obliterated serial marks) (ellipsis and alteration in the original). Thus, § 922(k)'s proscription against transporting,

10

shipping, or receiving, in interstate or foreign commerce, any firearm with an obliterated or altered serial number imposes a particular condition and qualification on the commercial sale of arms which is designed to discourage the use of untraceable firearms and keep them out of the hands of those most likely to use such weaponry for unlawful activity.

Importantly for our purposes, it should be noted that Congress further amended § 922(k) in 1990 so as to also make it unlawful for any person knowingly "to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce."  Comprehensive Crime Control Act of 1990, Pub. L. 101-647, § 2202(b), 104 Stat. 4789 4856.  The intent of this amendment was to expand the time frame for establishing interstate movement of the contraband, thereby expanding federal jurisdiction beyond direct interstate trafficking in untraceable weaponry to include intrastate trafficking as well.  *See* H.R. Rep. No. 681, 101st Cong., 2d Sess., pt. 1 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6510 (explaining that the amendment will "expand Federal jurisdiction to permit prosecution for transactions involving ... firearms missing serial numbers where the firearms have already moved in interstate or foreign commerce" prior to the obliteration of the mark); Comprehensive Violent Crime Control Act of 1989:  Hearing on H.R. 2709 Before the Subcomm. on Crime of the House Comm. on the Judiciary, 101st Cong., 2d Sess. 79-80 (1990), comments of Assistant Attorney General Edward Dennis (explaining that the amendment "would expand federal jurisdiction to permit federal prosecution for trafficking in firearms which ... have had the serial number removed or altered and which have moved in interstate commerce at any time").

Although the *Heller* Court declined to exhaustively define the outer boundaries of the Second Amendment's protection, its implicit sanctioning of laws imposing conditions and qualifications on the commercial sale of arms and laws prohibiting presumptively risky individuals from possessing firearms is significant.  Section 922(k) partakes, to

some extent, of both characteristics. It is part of a regulatory scheme designed to impose and enforce a specific condition upon the commercial sale of arms – namely, the requirement that all firearms which pass at some time through interstate commerce bear an intact serial number. This requirement, in turn, serves the government's interest in discouraging the availability of untraceable firearms and ensuring that they do not fall into the hands of those individuals who would be inclined to use them for unlawful purposes.[7]

Even if *Heller* cannot be read to implicitly sanction the type of regulation contained in § 922(k), it does not follow inexorably from *Heller* that § 922(k) must survive strict scrutiny in order to pass constitutional muster. Indeed, the *Heller* Court expressly disavowed any intention of setting a definitive standard of review in Second Amendment cases and instead left that issue to be sorted out in subsequent rulings. *See Heller*, 128 S. Ct. at 2821. Moreover, the Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review. *See* 128 S. Ct. at 2851 (Breyer, J., dissenting) ("[T]he majority implicitly, and appropriately, rejects th[e] suggestion [that strict scrutiny would be the appropriate standard of review] by broadly approving a set of laws – prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales – whose constitutionality under a strict scrutiny standard

---

[7] Section § 922(k), as applied to this case, is no less constitutionally valid simply because the Defendant is not a federally licensed firearms dealer. I do not read the *Heller* majority's sanctioning of "laws imposing conditions and qualifications on the commercial sale of arms," 128 S. Ct. at 2817, as an indication that the government may regulate interstate commerce of firearms only insofar as it occurs through the ordinary channels of licensed dealers. Interpreting the Second Amendment in such a manner would lead to a bizarre result whereby the government would be powerless to regulate the trade of guns which occurs, often illicitly, in private settings and on the streets. I doubt that is what the *Heller* majority had in mind when it granted "presumptively valid" status to laws imposing conditions and qualifications on the commercial sale of arms.

would be far from clear.") (citing *ante*, at 2816).

In addition, the fact that the Second Amendment is enumerated in the Bill of Rights does not necessarily mean that strict scrutiny must be applied as a matter of course whenever a law burdens the right to bear arms in any manner. As one constitutional scholar has explained:

> The Court has never purported to apply strict scrutiny in every provision of the Bill of Rights. Of the "first ten amendments" a grand total of two trigger strict scrutiny. Laws invading on First Amendment rights of speech, association, and religious liberty are often subject to strict scrutiny, as are laws that restrict the due process and (invisible) equal protection guarantees of the Fifth Amendment. But strict scrutiny is nowhere to be found in the jurisprudence of the Second Amendment, the Third Amendment, the Fourth Amendment, the Sixth Amendment, the Seventh Amendment, the Eighth Amendment, the Ninth Amendment, or the Tenth Amendment. Two amendments trigger strict scrutiny; eight do not.

*See* Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 Const. Comment. 227, 229 (Summer 2006); *id*. at 239 ("[T]he old adage about laws infringing fundamental rights being subject to strict scrutiny remains a favorite of scholars, judges, and law students. And it is flatly wrong.").

Given the *Heller* Court's several references to First Amendment jurisprudence in the course of its opinion, Defendant contends that "it is appropriate to look to the Court's free speech jurisprudence to discern how strict scrutiny review should be applied to legislation that burdens the right to keep and bear arms." (Def.'s Mot. to Dismiss Indictment [60] at p. 8 of 9.) From there, Defendant likens § 922(k) to a content-based regulation of speech which invokes a presumption of unconstitutionality, *see United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 817 (2000), and which requires the government to prove that the regulation in question is narrowly tailored to serve a compelling government interest and that it is the least restrictive means to achieve that interest. *See United States v. Stevens*, 533 F.3d 218, 232 (3d Cir. 2008 (*en banc*) (citing *Sable Commc'ns of Calif., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)).

Assuming for the moment that First Amendment law provides a suitable framework for determining the validity of § 922(k), it does not necessarily follow that strict scrutiny is the appropriate standard of review in this case:

> Perhaps the most preferred of all rights is the freedom of speech, the so-called First Freedom. Yet strict scrutiny is not always applied in free speech cases. Traditional speech doctrine distinguishes between regulations that are content-based and those that are content-neutral. The former generally trigger strict scrutiny, but the latter do not. Content-neutral laws that limit the freedom of speech are subject to the much more deferential standard of United States v. O'Brien, [ ] under which laws are regularly upheld. [ ] Even content-based speech regulations do not always receive strict scrutiny treatment. If the content regulated is commercial speech, the courts apply a form of intermediate review established in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York. [ ] A similarly less stringent form of review is applied to content-based regulations when the government is acting as an employer (as compared to a sovereign) under the rule of Pickering v. Board of Education. [ ] These First Amendment doctrines have led Ashutosh Bhagwat to characterize intermediate scrutiny as the "test that ate everything" in free speech jurisprudence. [ ]

Adam Winkler, *supra*, at 237-38 (endnotes omitted). Thus, even in cases involving the infringement of First Amendment rights, it is by no means a given that strict scrutiny will be applied.

In the area of free speech jurisprudence, "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed" are considered content-based. *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994). Such restrictions are presumptively invalid and subject to the most exacting scrutiny because they create the "inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Id*. at 641. *See id*, at 642; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Thus, "[t]o justify a content-based restriction, the government must show that the regulation or restriction is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 193 (3d Cir. 2008) (citation omitted).

14

Restrictions on speech that are neutral in terms of viewpoint and subject-matter, on the other hand, "may permissibly regulate the time, place, or manner of expression if they are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Startzell*, 533 F.3d at 193. The Third Circuit has explained the concept of content-neutrality as follows:

> To determine if a restriction is content neutral, "(t)he principal inquiry ..., in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward [v. Rock Against Racism]*, 491 U.S. [781, 791 (1989)]. It is the government's purpose that controls. *Id*. A regulation is deemed content neutral if it serves purposes unrelated to the content of speech, regardless of whether it incidentally affects certain speakers or messages and not others. *Id*. That is, government regulation of speech is properly regarded as content neutral if it is "*justified* without reference to the content of the regulated speech." *Id*. (citation and internal quotations omitted) (emphasis in original).

*Startzell*, 533 F.3d at 197 (ellipsis in the original).

Here, as I have discussed, the restriction imposed by § 922(k) does not target any particular "class of 'arms' overwhelmingly chosen by American society" for a lawful purpose, 128 S. Ct. at 2817, nor does it target any particular class of otherwise law-abiding gun owners. The law does not suppress or limit the right of law-abiding citizens to possess firearms generally, but merely regulates the manner in which they may be possessed – requiring, in essence, only that the firearm in question bear, in tact, the manufacturer's or importer's original serial number, which is the norm in the firearms industry. In sum, the burden which § 922(k) imposes on the right to bear arms is both incidental and minimal, and it makes no sense to equate § 922(k) to a content-based regulation on protected speech.

If this Court were to fashion a standard of review based on principles borrowed from First Amendment jurisprudence, a more appropriate standard of review would be the standard applicable to content-neutral time, place and manner restrictions. Section 922(k), as previously discussed, is designed to discourage the use of untraceable firearms and, in so doing, assist law enforcement in solving crimes and in keeping

15

firearms away from those individuals who are likely to use them toward unlawful ends. As I previously noted, firearms with intact serial numbers are the norm in this society and are readily available to citizens who are otherwise permitted under the law to possess guns. As a practical matter, in the overwhelming majority of cases, the restriction imposed by § 922(k) will burden only those individuals who have a particular interest in possessing an untraceable weapon – a characteristic for which this Court is hard-pressed to imagine any legitimate use. Thus, the regulation is narrowly tailored and leaves open ample opportunity for law-abiding citizens to own and possess guns within the parameters recognized by *Heller*. Under this standard of review, § 922(k) passes constitutional muster.

## CONCLUSION

In sum, I see nothing in the Supreme Court's recent decision in *District of Columbia v. Heller* that would compel the conclusion that 18 U.S.C. § 922(k), as applied in this case, is unconstitutional. Defendant cites no other case or source of law which arguably places the validity of § 922(k) in question. Accordingly, for the reasons set forth above, the Defendant's motion to dismiss the indictment will be denied.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA )
        v. ) Criminal No. 07-24 Erie
MICHAEL P. MARZZARELLA )

## O R D E R

AND NOW, *to wit*, this 14th day of January, 2009, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's Motion [60] to Dismiss Indictment is DENIED.

        s/    Sean J. McLaughlin
            SEAN J. McLAUGHLIN
            United States District Judge

cm:    All counsel of record.